# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**UNITED STATES OF AMERICA,**

*Plaintiff*,

*v.*

**WILLIAM GLENN CHUNN**
a/k/a "BIG HEAD";

**AARON MATTHEW RENTFROW**
a/k/a "Mongo";

*Defendants*.

CAUSE NO. 3:20-CR-00128-CWR-LGI

## ORDER

Before the Court are defendants William Glenn Chunn and Aaron Matthew Rentfrow's *Motions for New Trial*, Docket Nos. 238 and 240, the United States' responses in opposition, Docket Nos. 241 and 242, and Chunn's reply, Docket No. 243. Having reviewed the submissions of the parties, along with relevant case law, the motions will be denied.

**I.    Factual and Procedural History**

On September 22, 2020 a Federal Grand Jury in the Southern District of Mississippi charged Chunn, Rentfrow, and other co-defendants with Violent Crimes in Aid of Racketeering ("VICAR") – Assault (Count One) and VICAR – Attempted Murder (Count Two) for violent acts committed while housed at the United States Penitentiary in Yazoo City, Mississippi. Docket No. 3. The allegations in the indictment stem from the defendants'

participation in the stabbing of an inmate for the purpose of gaining entrance to and maintaining position in the Aryan Circle, a white supremacist organization.

This motion involves two rulings the Court made toward the end of the trial. Both rulings concern notes that the Court received from the jury—one during the trial, and the other during deliberations. The first note came on September 23, 2022, and read as follows:

> We (<u>some</u> of the members of the jury) were wondering if Chunn is incarcerated or not?
>
> Also…
>
> We (some of the jurors) are concerned about our safety after the trial is over + wondering if there has ever been harm to jurors anytime (days/weeks/months) after the trial has concluded? (This harm I mentioned may come from persons in the trial or may come from associates with persons in the trial.)

The defendants immediately moved for a mistrial, arguing that the note revealed that the jury was no longer impartial and had deliberated prior to the end of trial. Docket Nos. 238 and 240. The Court gave the parties until 5:00 p.m. on September 25, 2022 to submit briefs on the issue. All parties submitted briefs by the deadline.

On September 27, 2022, the Court held a conference call to notify the parties of the procedure it would take in response to the jury note. The Court informed the parties that it would voir dire each juror individually and inquire as to their knowledge of the note. The response to the first inquiry would dictate further questioning.

Before the trial resumed on October 3, 2022, the Court questioned each juror in the presence of counsel for both parties.

First up was Juror 1. Juror 1 indicated that she knew about the jury note and that she had authored the note on her own volition, after a previous exchange with Juror 2. Juror 1

explained that she and Juror 2 wondered if there had ever been any repercussions against jurors due to the Aryan Circle's members or associates in the "Free World."[1] Juror 1 emphasized that the extent of her exchange with Juror 2 was limited to that query only and that they had not discussed any specific detail from the case. Juror 1 further reiterated that she had consistently followed the Court's instructions and would continue to do so. Juror 1 stated that she would remain fair and impartial for the remainder of the trial, even if the Court could not answer her questions in the note.

Next, the Court questioned Juror 2. Juror 2 had no knowledge about the note. Juror 2 explained that she had a limited exchange with Juror 1 about whether the defendants were currently incarcerated. Juror 2 clarified that she wondered whether the defendants were currently incarcerated because she was "a nervous person in general" and felt that the defendants were looking at her throughout the trial. Docket No. 241. When asked by the Court, Juror 2 explained that her nerves did not and would not impair her ability to listen to, concentrate on, or evaluate the evidence. Juror 2 also reiterated that she had consistently followed the Court's instructions and would continue to do so, even if the Court could not answer her questions.

To confirm no other juror knew about or discussed the jury note, the Court proceeded to conduct an individual voir dire of all 11[2] remaining jurors. The remaining jurors expressed that they did not have any knowledge of the note. All 11 remaining jurors indicated that they had followed and would continue to follow the Court's instructions not to discuss the case

---

[1] The Free World refers to a branch of the Aryan Circle comprised of non-incarcerated members. There was significant testimony in this case concerning Free World actors.

[2] This figure includes 10 jurors and one alternate. Three jurors were dismissed for COVID-19 diagnoses.

3

with anyone until jury deliberations commenced. Each remaining juror reaffirmed that they could remain fair and impartial.

After the individual voir dire, the parties made arguments before the Court on the record regarding whether the Court should retain Jurors 1 and/or 2 or declare a mistrial. The Court then denied defendants' motions for a mistrial. The trial proceeded and both parties rested without additional witness testimony. The parties presented their closing arguments, and the jury was charged with jury instructions to begin their deliberations.

The second note concerned the Court's jury instructions. The jury instructions included both the federal law for aiding and abetting and state law for accessory before the fact. *See* Jury Instructions C-27 and C-29. During jury deliberations, the Court received a note from the jury inquiring about the meaning of the term "present" as used in the aiding and abetting instruction. The Court convened the parties to collaborate on a response to the note.

At Chunn's request and with the government's concurrence, the Court instructed the jury that a person is "present aiding and abetting, if, with the intention of giving assistance, he be near enough to afford it should the occasion arise." The Court took this definition from *Walters v. State*, 65 So. 2d 465, 468 (Miss. 1953), as urged by Chunn's counsel. Chunn's counsel was satisfied with the Court's proposed instruction. Shortly after the Court clarified the instruction, the jury unanimously returned a verdict of guilty as to both counts against Chunn and applied the hate crime enhancement. Docket No. 225. The jury also returned a verdict of guilty as to both counts against Rentfrow, though it did not apply the hate crime enhancement as to him. *Id.*

On October 24 and 25, 2022, defendants Chunn and Rentfrow filed motions for new trials and submitted memoranda in support of their motions. Docket Nos. 238 and 240.

4

Chunn asserts that his convictions should be vacated and a new trial granted for two reasons: 1) at least one juror was biased because they deliberated while under the fear of their safety; and 2) the jury instruction for accessory before the fact was improper based upon the government's theory of the case and the evidence presented at trial. Docket No. 238. Like Chunn, Rentfrow asserts that his convictions should be vacated and a new trial granted because members of the jury engaged in prejudicial misconduct. Docket No. 240. The Court takes up each argument below.

## II.     Legal Standard

Under Federal Rule of Criminal Procedure 33, "upon the defendant's motion, the Court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The Fifth Circuit recognizes "the generally accepted standard . . . that a new trial ordinarily should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.'" *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)). As the movants, defendants bear the burden of proving that a new trial is warranted. *United States v. Soto-Silva*, 129 F.3d 340, 343 (5th Cir. 1997).

## III.    Discussion

### A.     The Jury Note

In any trial, there is an initial presumption that the jury is impartial. *United States v. Kelley*, 140 F.3d 596, 608 (5th Cir. 1998). However, this presumption can be overcome "through evidence that an extrinsic factual matter actually tainted the jury's deliberations." *Id.*; *see also United States v. Chiantese*, 582 F.2d 974, 979 (5th Cir. 1978) (recognizing that the insinuation of outside influences is inimical to the premises upon which our system of justice

rests). If such a showing is made, the defendant "enjoys a rebuttable presumption of prejudice unless the government proves the harmlessness of the breach." *See Kelley*, 140 F.3d at 608. Only then is the defendant entitled to a new trial. *Id*.

Generally, though, the district court maintains broad discretion to decide matters of impartiality. As recognized by the Fifth Circuit, that discretion is especially broad in matters of intrinsic influence. [3] *See United States v. Sotelo*, 97 F.3d 782, 796 (5th Cir. 1996); *see also United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984) (emphasizing that the Fifth Circuit declines to presume prejudice from intrinsic influences because it would hamper the judge's discretion). Moreover, as the Fifth Circuit has explained, because a district court is in a "unique perspective at the scene, it is in a far superior position than the [Fifth Circuit] to appropriately consider allegations of juror misconduct, both during trial and during deliberations." *United States v. Ebron*, 683 F.3d 105, 126 (5th Cir. 2012).

The heart of Chunn and Rentfrow's argument relies on the notion that Juror 1 and 2's musings about juror safety are extrinsic factors that automatically rise to the level of prejudice. Such reliance is misplaced. Under Fifth Circuit precedent, jurors' fears or safety concerns are neither extrinsic influences nor are they sufficient grounds for a new trial. *See United States v. Nieto*, 721 F.3d 357, 371 (5th Cir. 2013) (upholding a district court's decision denying a defendant's motion for mistrial based on the jury's expression of safety concerns during trial); *see also Kelley*, 140 F.3d at 608-09 (finding no evidence of outside or extrinsic influence where the jury indicated that it was hesitant to return a verdict because some jurors

---

[3] "Case law speaks in terms of extrinsic influences such as trial publicity, *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978), versus intrinsic influences such as a juror announcing that he had determined the defendant was guilty prior to the end of the trial," *United States v. Webster*, 750 F.2d 307, 337 (5th Cir. 1984).

6

were afraid for their and their families' safety). Instead, because Juror 1's concerns about safety were developed *during* trial itself, those concerns are properly characterized as intrinsic and evaluated using the Court's broad discretion.[4]

Here, the Court employed a cautious approach to ensure continued juror impartiality. Even though the Court determined Juror 1 and Juror 2's exchange was limited to them only, and that Juror 1 alone wrote the note, it still proceeded to question all remaining jurors. None of the remaining jurors knew about the jury note. Each of them indicated that they had followed the Court's prior instructions, and that they would remain fair, impartial and follow the Court's instructions for the rest of the trial.

The roots of Juror 1 and 2's safety concerns were grounded in matters related directly to trial – they were intrinsic. At no point during the Court's near two-hour questioning of all 13 jurors did the Court learn of any extrinsic evidence that may have improperly influenced any juror individually or the jury collectively. This is not a situation where jurors were bribed or formed preconceived determinations about the defendants' guilt before the commencement of trial due to publicity. Rather, this is a situation where two jurors made a passing remark as to their curiosity about the defendants' incarceration to one another. There is no evidence in the record to suggest that Jurors 1 and 2 spoke about anything else about the trial – i.e., that they formed opinions as to the verdict, discussed their processes, indicated any showing of bias, or evaluated any witness's testimony with one another – more than the limited exchange they had.

---

[4] Ideas, thoughts, and beliefs developed during trials are generally characterized as intrinsic. *See United States v. Scott*, 576 Fed. App'x 409, 413 (5th Cir. 2014).

The mere existence of dialogue between jurors does not mandate a presumption that such dialogue involves an extrinsic factual matter rising to the level of prejudice. There is no evidence in the record to suggest that either Juror 1's curiosity or Juror 2's anxiety would impair their ability to listen to, concentrate on, or evaluate the evidence. Jurors 1 and 2 reiterated that they would continue to follow the Court's instructions, and remain fair and impartial, even if the Court could not answer the questions. And all 11 remaining jurors also confirmed that they, too, would also continue to follow the Court's instructions and remain fair and impartial.

Consequently, because there is no evidence of extrinsic influence, and the Court conducted a thorough inquiry of the jury note before proceeding forward with trial to ensure fairness, defendants fail to make an adequate showing that an extrinsic factual matter actually tainted the jury's deliberations. There is no presumption of prejudice; therefore, the Court need not address the remaining steps of the applicable legal standard. *See Kelley*, 140 F.3d at 608.

### B. The Jury Instruction

To determine whether a jury instruction is improper, the Court "considers whether the charge, as a whole was a correct statement of law" and "whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009).

Chunn asserts that the jury was improperly instructed on the accessory before the fact instruction because the evidence presented at trial failed to support that he was "not present" during the attack. Even though he was seated on the first floor of the J-2 Unit, Chunn contends, per the United States' theory of the case, that he was near enough to provide

8

assistance during the assault. Docket No. 239. Under that theory, Chunn argues, it follows that he was "present" during the attack because he personally instructed Rentfrow and other co-defendants to "make sure the victim did not come out of his jail cell" and "to return to 'finish' the job." Docket No. 243. To Chunn, the question as to whether he was present under Mississippi law rests simply upon what he was "doing while the crime was being committed." *Id*.

The Court respectfully disagrees. Under Mississippi law, an accessory before the fact is "one who procures, counsels, or commands another to commit a felony for him, but is not himself present, actually or constructively, when the felony is committed." *Huff v. Edwards*, 241 So. 2d 654, 657 (Miss. 1970). The concept of "an accessory before the fact involves some participation in the criminal act." *Clemons v. State*, 482 So. 2d 1102, 1105 (Miss. 1985).

Therefore, the issue is not what Chunn was doing while Rentfrow assaulted M.M. Rather, the issue is whether Chunn *intended to assist* his co-defendants in the commission of the felony, and if so, whether he was near enough to afford it should the occasion arise. It is not necessary that a party be physically present at a criminal transaction to make him or her guilty as an aider and abettor. *Mangum v. State*, 762 So. 2d 337, 344 (Miss. 2000). The presence required to render one an aider and abettor to a crime may be constructive, as where one, acting with another in the pursuance of a criminal design, is so situated when the crime is committed as to be able to assist in its commission. *Walters*, 65 So. 2d at 468. The analysis of whether Chunn was present with the *intention of giving assistance*, thus, is a factual one.

During trial, the jury saw by video and heard evidence relating to Chunn's actions on the day of the assault. The jury watched video evidence showing Chunn avoiding the second floor of the J-2 Unit, as he was "occupied watching television." Docket No. 241. The jury

9

continued watching evidence demonstrating that Chunn did not proceed to the second floor of the J-2 Unit until after the offense was completed. The jury then heard testimony indicating that Chunn and a co-defendant had evidence from the subject offense removed from a trash can near their cells because they did not want to be proximate to any of the evidence from the offense. Moreover, the jury continued to hear testimony from various witnesses who testified that Chunn had knowledge of the offense, was the orchestrator behind it, and was present in the J-2 Unit. *Id.*

The jury was confronted with these factual issues during the trial. And with those facts in hand, they were left to evaluate the evidence and come to one of three possible conclusions as to Chunn's presence: 1) Chunn was present by actively participating in the commission of the assault; 2) Chunn was present with the intention of giving assistance should the occasion arise; or 3) Chunn was not present at all. Even when viewed in the light most favorable to Chunn, the fact that the jury submitted a note inquiring as to the meaning of "present" indicates that at least one juror had a question as to whether Chunn was present during the attack. That inquiry illustrates that whether Chunn was present during the attack, at minimum, was an open question.

Again, Chunn's argument is that the jury was improperly instructed on the accessory before the fact instruction. If the law isn't enough, it was Chunn who urged the Court to adopt the accessory before the fact instruction that the Court ultimately provided to the jury. The fact that Chunn received an unfavorable verdict does not now render this Court's instruction erroneous. Because the evidence submitted at trial created a factual question as to whether Chunn was present with the intention of giving assistance, and the Court's charge as a whole was a correct statement of law, it was properly submitted to the jury.

**IV.    Conclusion**

For the foregoing reasons, defendants' motions are denied.

**SO ORDERED**, this the 19th day of December, 2022.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE
